## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE NO.** |
| | **:** | **1:14-CR-203-ODE-AJB** |
| **CHENHSIN CHAN,** | **:** | |
| *a/k/a* **Paul Chan,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are Defendant Chenhsin Chan's motions to suppress evidence and release funds, [Doc. 16], and to suppress statements, [Doc. 35]. For the following reasons, the undersigned **RECOMMENDS** that both motions be **DENIED**.

### I.    *Introduction*

Chan is named in a thirty-count indictment with mail fraud, introduction of adulterated food, knowing distribution of a listed chemical, and money laundering. [Doc. 1]. He filed a motion to suppress evidence and release funds, [Doc. 16], in which he sought (1) suppression of statements he made to law enforcement on the day that his parents' home was searched pursuant to a federal search warrant; (2) suppression of evidence seized pursuant to search and seizure warrants; and (3) an order releasing certain property seized for forfeiture. The Court

discusses each request in that order.

## II.   *Statements*

### A.   *Facts*

The Court held an evidentiary hearing on the motion to suppress statements, [Doc. 34 (hereinafter "T__")], at which Food and Drug Administration ("FDA") Criminal Investigations Special Agent ("SA") Wong and Defendant Chan testified. The testimony established that on April 29, 2012, Wong and other FDA agents from the FDA's New York field office were executing a search warrant at Defendant's parents' home in Rosedale, Queens, New York. T4-5. Chan used his parents' house as his office. T28. Approximately ten law enforcement agents were involved in executing the warrant. T17. Once the door opened at the parents' home, agents entered the residence, but their guns were not drawn. T15. Defendant's parents and his sister-in-law were present. T17.

Defendant's residence was located in Elmhurst, Queens, New York, approximately one-half hour away from where his parents lived. T6. At the time of the search, other FDA agents were surveilling Defendant's residence and saw him removing bags from his home and placing them in a Mercedes Benz CLK 430 that was parked on the street. The surveilling agents communicated their observations to

2

SA Kriplean, who headed the search team at the Rosedale residence.  T6-7.  The surveilling agents followed Defendant to the "Stop & Stor" storage facility on Grand Avenue in Elmhurst, where Defendant was seen going inside the location and speaking to the storage facility staff.  T7.  When Defendant left the Stop & Stor, the agents followed him to another storage facility (that he did not enter) and then saw him go back to the Stop & Stor.  T7.  At this point, the surveilling agents reported to Kriplean that they had seen a blue drum inside Defendant's vehicle.  T8.

Kriplean and Wong left Defendant's parents' home and drove to the Stop & Stor. T8.  Upon their arrival at about 1:30 p.m., the agents approached Chan inside the Stop & Stor, identified themselves and showed him their credentials, and asked him whether he would step outside because they wanted to speak with him.  T9.  Chan seemed surprised at first, but agreed to go outside with the agents.  T9.

The agents stood on the public sidewalk with Chan in the presence of passing pedestrians.  T9.  Kriplean was attempting tell Chan why they were there, but Chan stated that he already knew why because his lawyer had told him that the agents were searching his parents' house.  He also stated that he had spoken to his suppliers, who told him to be careful.  T10.

Wong testified that Kriplean advised Chan that he was not under arrest and that

he was free to leave, and that they were there just to speak to him.  T10, 14.  Chan responded that he had spoken to his lawyer, who in turn told him not to make any statements, but Chan added that he was willing to provide as much information as possible.  T10, 24.  Wong further testified that Kriplean attempted to clarify this statement by asking Chan whether he would answer questions.  Chan responded that he was willing to cooperate, but that "I just don't want to incriminate myself."  T11.  Kriplean began to ask questions but told Chan that if he did not feel comfortable, they could stop the questioning at any time.  T11.  Wong primarily took notes during the course of the thirty minutes of questioning.  T19.

The agents wore ballistic vests identifying them as FDA agents.  T25.  They were armed but their weapons were holstered.  T25.  During the encounter, Chan was not patted down.  T25.  Chan appeared relaxed and not afraid.  T11.  The interview was conducted in English.  T25.  At no time during the encounter with the agents was Chan handcuffed.  T9.

During the questioning, Chan was asked to provide his driver's license but he refused to do so.  Kriplean moved on with other questions.  T11.  There were questions that Chan declined to answer, and in those instances, Kriplean moved on to other questions without pressing the issue.  T11-12.  Kriplean told Chan about the arrest in

4

Georgia of Kevin Evans, who sold products to Chan.  T23.  Chan expressed no concern to the agents about the search warrant execution at his parents' home.  T24.

Chan declined consent to search his vehicle.  He was told that a search warrant was being applied for, and that he could either give the agents the keys to the vehicle and leave, or he could stay.  Chan stayed.  T12, 18.

The interview lasted approximately 30 minutes, up to the point of Chan's declination of consent to the search of the vehicle.  T12.  Pending receipt of the search warrant for the vehicle, for three to four hours, Chan remained with the agents outside of the storage facility.  T26.  The vehicle was visible but it was parked about one block away.  T26.  While waiting for the warrant, the agents engaged in occasional chitchat with Chan about his girlfriend.  T25.  Until the warrant arrived, Chan maintained possession of the keys to the vehicle.  T43.

The warrant was issued at 4:45 pm.  T64.  When the agents searched the vehicle once the warrant arrived, Chan stated that they would not find anything.  T13.  He also stated that he was removing items from his home to prevent the "cop from stealing it."  T13.

Chan testified at the hearing that he was taking items to his storage space because his office at his parents' home was not large enough to store all of his things.  T28.  He

first testified that once he arrived at the Stop & Stor, his lawyer Jason Hsuh called and told him that the FDA was raiding his parents' home, T28, 31.[1]  He testified that then his brother called and stated that agents with guns drawn were at the house and in his sister's face and that his family was afraid. T28, 29.[2]  Subsequently, Chan testified that he was at his home between 10 and 11 o'clock when Hsuh called him.  T34.  Chan testified that the report of the agents' actions reminded him of growing up under fascism in Argentina, so he wanted to get to his parents' house as soon as possible out of concern for his family.  T29.  He further testified that his lawyer told him not to make any statements.  T29.  He also testified that the lawyer also told him "[t]hat I should know what to do," which he testified he interpreted as he should go to his parents' house to help.  T36.  However, he did not go directly to his parents' house because he was "still conducting – carrying on my business."  T36.[3]  He testified that

---

[1]      Chan testified that Hsuh was his family's lawyer and that he had already retained for the FDA investigation, although he also claimed that he did not know at the time that he was being investigated.  T33.  He later claimed that he did not retain him for the investigation until after the date of the search warrant's execution.  *Id.*

[2]      Chan's father was 70 years old and his mother was 65 years old.  T30.

[3]      Chan also testified that he used the Grand Avenue storage facility but that space was leased in his sister-in-law's name.  T38.  He denied going to that location the morning of the search.  T39.

6

"his business" was fulfilling customers' orders, but on this occasion he was taking samples he obtained to the storage unit.  T55.

Chan additionally testified that he agreed to speak with the agents because Kriplean stated that they have a high conviction rate in these types of cases, that he should not take it to court, and that he (Kriplean) was the one who arrested Evans and sent him to jail.  Chan also testified that Kriplean told him that it would be beneficial for bargaining if he cooperated, and that is why he talked to the agents, contrary to his lawyer's advice.  T29.  He testified that he answered their questions because he was afraid of going to jail.  *Id.*  He also testified that Kriplean advised him that he was not free to leave.  T30.  He was not shown a copy of the warrant.  T30.  Chan also testified that Evans was one of his suppliers from Hi-Tech Pharmaceuticals, and that Evans gave him good prices.  *Id.*

On cross-examination, Chan acknowledged that he chose to not answer certain questions asked by the agents because he was told that he did not have to answer certain questions.  T41-42.  He further testified that, although he did refuse to consent to a search of the vehicle, he was told that the agents could simply break the window, T42, and that he was further told that if he left the scene, he would be arrested.  T43.  He also acknowledged buying and selling ephedrine-based products after 2004, contrary to

affidavits he had submitted earlier in this case. T46-50.[4]

## B. Arguments of the Parties

In his post-hearing brief, Chan argues that his statement, "I just don't want to incriminate myself," was a clear invocation of his right to remain silent and therefore the agents' subsequent questioning of him was unlawful. [Doc. 35 at 3-4 (citing *United States v. Lacouture*, 495 F.2d 1237, 1239 (5th Cir. 1974); *Williams v. Sec'y for Dept. of Corrs.*, 195 Fed. Appx. 939, (11th Cir. Sept. 15, 2006)); *id.* at 6]. He further argues that even if his invocation was ambiguous, the agents were required to seek clarification first before proceeding to question him, [*id.* at 4, 8], and instead they questioned him for 30 minutes without seeking clarification. [*Id.* at 7]. He also argues that he was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), since at the time of the questioning by the agents (1) he knew that other federal agents had raided his parents' home at gun point, and (2) he was given the option of surrendering his car keys to the agents or leaving, but he was in the middle of Queens without any meaningful ability to leave the scene. [*Id.* at 8-9].

The government in response contends that Chan was not in custody when he was

---

[4] There is no indication that Chan was arrested that day, nor was the Mercedes that he drove to the Stop & Stor seized. [*See* Doc. 25 at 2 n.2 (indicating that the Mercedes Benz CLK 430 was not seized)].

questioned by the agents on the public sidewalk outside of Stop & Stor, and as a result, he was not entitled to *Miranda* warnings.  [Doc. 41 at 4].  In support of its argument that Chan was not in custody or its effective equivalent, it argues that (1) the interview was in a public setting during daytime hours, (2) the agents did not brandish their weapons in Chan's presence, (3) he was not patted down or physically restrained; (4) the questioning only lasted 30 minutes; and (4) Chan knew he did not have to answer questions and he exercised that right on several occasions (and also declined to consent to the search of his vehicle).  [*Id.* at 6-7].   The government also argues that Chan's statements were voluntary, because he was told by the agents that he did not have to cooperate and he was free to leave.  *Id.* at 8.  Further, the government argues that he was not threatened by the agents or promised any benefits to answer questions. It submits that Chan exercised his right to not answer certain questions, and he refused to produce his driver's license or consent to the search of his vehicle.  [*Id.*].

As for Defendant's contention that his statements were preceded by an invocation ("I just don't want to incriminate myself"), the government argues that Chan's statement was not an unequivocal assertion of his right to remain silent and that, even though he was not required to do so, Kriplean sought clarification.  [*Id.* at 9].  The government then argues that because Chan exercised his right to not answer certain

AO 72A
(Rev.8/8
2)

questions, his statements were voluntary.  [*Id.* at 9-10].

In reply, Chan argues that the government unnecessarily focuses on the custody issue, but contends that his actual claim is that he invoked his right to remain silent, and that since he invoked, his subsequent statements are presumed involuntary.  [Doc. 44 at 1-2 (citation omitted)].  Thus, he argues, even if he was not in custody for *Miranda* purposes, his invocation invalidates his statements.  [*Id.* at 2-3].

## C.   Discussion

Chan's motion to suppress statements raises two issues: (1) whether he was in custody at the time of the questioning, and thus the agents were required to advise him of his *Miranda* warnings before questioning him; and (2) whether his statement that he did not want to incriminate himself amounted to an invocation of his right to remain silent.

### 1.   Credibility findings

Before addressing these issues, the Court observes that the disputed testimony at the evidentiary hearing requires the Court to make credibility determinations.  In this regard, the Court accepts the version of events as testified to by Wong and finds that Defendant's testimony was generally not credible on the contested issues.  First, one of the bases of Chan's motion to suppress and his testimony was that he was concerned

10

for his family's well-being and wanted to get to his parents' house as soon as possible–but instead he was coercively detained by the agents.  That testimony and those contentions are belied by the over two-hour delay between Chan's receipt of the calls from his lawyer and his brother about the FDA raid at his parents' home and his intervening stops at the Stop & Stor (including engaging in conversation with the storage location's attendant, particularly since he testified that he did not need to sign in to access his storage unit) and the drive-by of the Grand Avenue storage facility. Second, the Court discredits Chan's testimony in part because he testified inconsistently as to when he was advised by his lawyer that his parents' home was being raided. *Compare* T28-29 (he was at the Stop & Stor when his lawyer called) *with* T34 (he was at his home between 10 and 11 o'clock when Hsuh called him).  Third, the Court finds not credible Chan's testimony that he felt threatened by Kriplean's alleged statements about his high conviction rate and therefore answered the agents' questions, because this testimony was inconsistent with the undisputed evidence that Chan elected–without adverse consequences–to refuse to answer certain questions posed to him by the agents. Fourth, Chan's testimony about Kriplean's threats to break into Chan's vehicle to search it was not credible, given Chan's refusal to consent to the search that was honored by the agents.  Fifth, Chan's earlier affidavit about his lack of dealings in

11

ephedrine was clearly not credible since it was contradicted by his hearing testimony, thus further casting doubt that his testimony was worthy of belief.  As a result, the Court adopts Wong's testimony as the accurate version of events.  Thus, specifically, the Court finds that the agents did not threaten Chan or direct that he remain, and Chan was not concerned enough about the safety of his family members who were present at the searched residence to interrupt his business dealings to go to his parents' home. Therefore, the Court finds that Chan's testimony that he was intimidated by the agents due to their statements to him or the search of his parents' home not persuasive.

Turning to the merits of the custody issue, the Supreme Court in *Miranda* held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984).  *Miranda* does not apply, however, "outside the context of the inherently coercive custodial interrogations for which it was designed." *Id.* (internal quotation marks omitted).

The Eleventh Circuit has explained that "although a reasonable person in the defendant's position may feel constrained not to leave . . . —and thus may be deemed

AO 72A
(Rev.8/8
2)

to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). Rather, *Miranda* warnings are required only where the totality of the circumstances shows that a reasonable person in the defendant's position "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (internal quotation marks omitted); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (recognizing that an individual is considered to be "in custody" for purposes of receiving *Miranda* protection where "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.") (quotation marks omitted); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009) (same). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant," *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); and " 'the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.' " *United States v. Jayyousi*, 657 F.3d 1085, 1109 (11th Cir. 2011) (quoting *Moya*, *id.*).

Several factors guide the determination of whether an environment is coercive enough to be custodial. For instance, "courts are much less likely to find the

13

circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the [defendant]'s home." *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (alteration and internal quotation marks omitted); *see also Luna-Encinas*, 603 F.3d at 882 (same).   Whether a defendant was "[u]nambiguously advis[ed] ... that he [wa]s free to leave and [wa]s not in custody" is another "powerful factor" that "generally will lead to the conclusion that the defendant [wa]s not in custody." *Brown*, 441 F.3d at 1347.   Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal quotation marks omitted); as well as whether the defendant was physically restrained and the duration of the interview.   *See Luna-Encinas*, 603 F.3d at 881; *Brown*, 441 F.3d at 1349.   "An interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." *United States v. Matcovich*, 522 Fed. Appx. 850, 851 (11th Cir. July 3, 2013) (quoting *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quotation marks omitted)).   The defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.   *United States*

*v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978)[5] (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).

Applying these factors, Chan has not established that he was in custody for *Miranda* purposes. First, the questioning occurred in public on the street–a neutral location–in the view of passing pedestrians. *United States v. Crawford*, 294 Fed. Appx. 466, 474 (11th Cir. Sept. 19, 2008) (defendant not in custody where he was standing at the back of his car in a parking lot open to public view, he was not physically restrained, he was questioned only briefly and he was not told he was going to be arrested); *see also United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004) (holding that defendant was not in custody where he "was stopped in the parking lot of an apartment building in broad daylight. The officers' actions were visible to anyone in the area who chose to look."). Second, he was unambiguously advised that he was

---

[5]    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

AO 72A
(Rev.8/8
2)

not under arrest and was free to leave, and that the agents were there just to speak to him.  T10, 14.  "[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of *substantial importance* in determining whether a reasonable person would have felt free to leave."  *Brown*, 441 F.3d at 1347 (emphasis added); *see also Matcovich*, 522 Fed. Appx. at 852 (holding that telling suspect he was not under arrest and was free to leave "strongly suggest[s] that [his] interrogation was not custodial").

Third, at no time during the questioning was Chan threatened, handcuffed, or physically restrained.  *See  Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (defendant was not in custody because there was no indication that his freedom to depart had been restricted in any way); *see also United States v. Maldonado*, 562 Fed. Appx. 859, 861 (11th Cir. Apr. 7, 2014) (no custody where defendant not physically restrained during questioning).  As noted, the Court rejects as not credible Chan's testimony about feeling threatened by Kriplean's alleged statements, *inter alia*, about his conviction rate.  Fourth, although the agents were dressed in clothing demonstrating they were law enforcement officers, and they were armed, their firearms were not unholstered during the questioning.  Fifth, the evidence demonstrates that Kriplean and Wong used no tone, words or actions that indicated to Chan that he had to submit to questioning.  In fact, the exact opposite is true, since Kriplean advised Chan that he was free to leave

16

and he did not have to answer any questions, and if he did choose to answer questions, he could stop answering questions at any time.  Any comments about the arrests of Chan's associates in Georgia did not transform this non-custodial questioning into custodial questioning.  Sixth, the questioning last no more than 30 minutes; questioning of a much longer duration has been found not to convert a non-custodial interview into custodial questioning mandating *Miranda* warnings.  *See Muegge*, 225 F.3d at 1269-71 (no custody where defendant was directed by supervisor to speak with investigators at a secure site in an interview room with the door closed, where he was interviewed for approximately two and half hours, and was not formally arrested until eight months later); *McDowell*, 250 F.3d at 1363 (holding that "there is no fixed limit to the length of questioning" and finding four hour inquiry at Port Everglades not a custodial interrogation); *United States v. Manta-Carillo*, Criminal No. 11-00103-CB, 2011 WL 3235757, at *2, 4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half); *United States v. Dix*, No. 3:12-cr-7-TCB-RGV, 2013 WL 610219, at *5 (N.D. Ga. Jan. 29, 2013) (finding defendant was not in custody when officers entered his store with weapons drawn to execute search warrant, handcuffed defendant, and escorted defendant outside where he was immediately un-handcuffed and then interviewed by two agents in an unmarked

17

government truck for an hour and a half). *Accord United States v. Hughes*, 640 F.3d 428, 435-37 (1st Cir. 2011) (holding that suspect was not in custody where the interview occurred in his home; the number of officers was "impressive but not overwhelming" and only two officers participated in the questioning; there was no show of force and no weapons were brandished; the defendant was not restrained physically; the "ambiance was relaxed and non-confrontational"; and the interview lasted for ninety minutes—a "relatively short duration").

Next, despite Chan's testimony that he consulted with a lawyer shortly before being confronted by the agents, and his acknowledgment that his lawyer told him not to say anything, while interacting with Kriplean and Wong, Chan never asked to speak with his lawyer, nor did he ask to end the interview or to leave the premises. *See Luca-Encinas*, 603 F.3d at 882; *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (concluding that defendant was not in custody because, *inter alia*, he "never requested a lawyer or to terminate the interview").

As to Chan's complaint that he effectively was stranded by the agents' statement that they were going to search his vehicle and that if he wanted to leave he had to give them the keys to the car, the evidence demonstrates that the interview had ended before the topic of the search of the vehicle was broached, and thereafter, any statements he

18

made were not prompted by questioning by the agents, such as when he remarked they would not find anything once the agents executed the search warrant on the vehicle.

In conclusion, Chan's interaction with Kriplean and Wong did not involve the type of "highly intrusive" coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made.  The totality of the circumstances were such that a reasonable person in Chan's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.  No *Miranda* warnings were required at the time.  *Luna-Encinas*, 603 F.3d at 882; *Acosta*, 363 F.3d at 1150.  Because Chan was not in "custody" when he made any statements, the agents were under no obligation to advise him of his *Miranda* rights.  Therefore, the Court rejects Chan's contention that he was subjected to an un-*Mirandized* custodial interrogation.

Moreover, Chan's statements were voluntary.  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement:  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).  The Court must consider the totality of the circumstances in assessing whether police

19

conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has " 'enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . .' " *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) (quoting *Gonzalez*, 71 F.3d at 828 (citations omitted)). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of

20

realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

Here, many of the facts that support the conclusion that Chan was not in custody demonstrate that his statements were voluntary. Although the evidentiary hearing record as to Chan's educational background is silent, the record of this case demonstrates Chan was intelligent, since he ran a sophisticated and profitable dietary supplement business, and the memorandum of interview from his questioning (that he submitted in support of his motion) shows that he graduated from Stony Brook University and he had a background in Internet Technology. [*See* Doc. 16-3 at 2]. Further, the questioning was relatively brief and it occurred in a public space in view of passers-by. He was told that he was not under arrest and that he was free to leave. The agents did not unholster their firearms, physically restrain or touch Chan, nor did they make any threats or promises. Most significantly, Chan chose not to answer several questions, and refused to give his identification or consent to the search of the vehicle, demonstrating that the atmosphere and the questioning did not inhibit Chan's ability to exercise free choice.

Therefore, the Court concludes that Chan's statements were voluntarily given,

and thus **RECOMMENDS** that the District Judge deny the motion to suppress statements on grounds of a *Miranda* violation or involuntariness.

### 2.    *Invocation of right against self incrimination*

The Court concludes that Chan did not unequivocally and unambiguously assert his right against self-incrimination and, thus, his statements are not subject to suppression on that ground either.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend V.  "[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination."  *Emspak v. United States*, 349 U.S. 190, 194 (1955) (citation omitted).  However, a defendant who wishes to invoke his right to remain silent must do so "unambiguously" and "unequivocal[ly]."  *See Davis v. United States*, 512 U.S. 452, 458 (1994) (stating that a "suspect must unambiguously request counsel" and "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him"); *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (noting that *Davis* held that an ambiguous or equivocal invocation of *Miranda*'s right to counsel did not require police to stop questioning or to ask only clarifying questions, and determining that "there is no

22

principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"); *Owen v. Florida Dep't of Corr.*, 686 F.3d 1181, 1192-93 (11th Cir. 2012) (holding that defendant's statements—"I'd rather not talk about it" and "I don't want to talk about it"—both were made in response to questions about specific, discrete details of the crime, not general questions about the crime itself, and thus his invocations were ambiguous).  As the Supreme Court has held, " '[a]lthough a suspect need not "speak with the discrimination of an Oxford don' . . ., he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459 (internal citation omitted).  To avoid difficulties of proof and to provide guidance to officers conducting interrogations—who must promptly cease questioning once a suspect has invoked the right to counsel—the inquiry is an objective one. *Id.* at 458-59. Although the parties do not address the relative burdens of proof on this issue, and the Court's research has disclosed no discussion of the issue by the Eleventh Circuit, other courts have placed the burden on the defendant to demonstrate that he clearly invoked the privilege against self-incrimination. *See United States v. Schlansky*, 709 F.2d 1079, 1084 (6th Cir. 1983) (holding that the party seeking to avoid compliance on the grounds

23

of self-incrimination is required to demonstrate that the privilege is properly claimed);

*see also People v. Tom*, 59 Cal. 4th 1210, 1225 (Cal. 2014) (same).   Whether an

invocation of the right to silence is unequivocal is determined by an objective inquiry.

*Williams v. Sec'y for Dep't of Corr.*, 195 Fed. Appx. 939, 940-41

(11th Cir. Sept. 15, 2006) (citing *Medina v. Singletary*, 59 F.3d 1095, 1101

(11th Cir. 1995)).

In this regard, Chan's argument that the agents had to seek clarification before

questioning him, [Doc. 35 at 4], is no longer an accurate statement of the law, because

the Supreme Court's *Davis* decision rendered previous Eleventh Circuit cases, on which

Chan relies, invalid:

> Before the Supreme Court's recent decision in *Davis*[ ], the rule in this
> Circuit was that:  "When a defendant makes an equivocal request for an
> attorney during a custodial interrogation, 'the scope of that interrogation
> is immediately narrowed to one subject and one only.  Further questioning
> thereafter must be limited to clarifying that request until it is clarified.' "
> *Owen v. Alabama*, 849 F.2d 536, 539 (11th Cir. 1988) (quoting *Thompson
> v. Wainwright*, 601 F.2d 768, 771 (5th Cir. 1979) (emphasis in original));
> *accord* [*United States v.*] *Mendoza-Cecelia*, 963 F.2d [1467,] 1472
> [11th Cir. 1992]].  We applied the same rule to equivocal invocations of
> the right to cut off questioning:  "[W]here an individual in custody makes
> an equivocal invocation of his right to remain silent, further questioning
> must be restricted to clarifying that request until it in fact is clarified, and
> no statement taken after the request but before the clarification can clear
> the *Miranda* hurdle."   *United States v. Pena*, 897 F.2d 1075, 1081
> (11th Cir. 1990) (citing *Martin v. Wainwright*, 770 F.2d 918, 924

24

(11th Cir. 1985), *modified*, 781 F.2d 185 (11th Cir. [ ]1986)); *accord United States v. Ramsey*, 992 F.2d 301, 305 (11th Cir. 1993).

However, our prior decisions must yield to supervening decisions of the Supreme Court. *E.g.*, *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1521 (11th Cir. 1994) ("It is the law of this Circuit that we are bound by a prior panel's decision except to the extent it is altered by a supervening Supreme Court decision, which we will, of course, follow instead.") *Davis* is a supervening decision which changes our "clarification only" rule. In *Davis*, the Supreme Court held that, "[a]lthough a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at [459] (internal quote marks and citation omitted). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at [461-62]. Although recognizing that "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," the Court pointedly declined to adopt a rule requiring that officers ask clarifying questions. *Id.* "Unless the suspect actually requests an attorney, questioning may continue." *Id.*

Because we are bound to follow the Supreme Court's holding in *Davis*, our decisions creating a duty to clarify a suspect's intent upon an equivocal invocation of counsel are no longer good law. Furthermore, we have already recognized that the same rule should apply to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel. *Martin v. Wainwright*, 770 F.2d 918, 924 (11th Cir. 1985) ("We see no reason to apply a different rule to equivocal invocations of the right to cut off questioning."), *modified on other grounds*, 781 F.2d 185 (11th Cir. [ ] 1986).

*Colemen v. Singletary*, 30 F.3d 1420, 1423-24 (11th Cir. 1994). Thus, a law

25

enforcement officer is not required to seek clarification of an unclear, unambiguous, or equivocal invocation:

> The suspect's request for counsel must be unambiguous and unequivocal. *See* [ ] *Acosta*, 363 F.3d [at] 1152-53 [ ]; *Davis* [ ], 512 U.S. [at] 461[ ] ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."); *Acosta*, 363 F.3d at 1152 ("If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation."). The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459[ ]. If the suspect's request is subject to "two reasonable, competing interpretations," it is ambiguous, and the interrogation may continue. *See Acosta*, 363 F.3d at 1155.

*United States v. Propst*, 369 Fed. Appx. 42, 46 (11th Cir. Mar. 9, 2010).

Here, when asked if he was willing to speak with the agents, Chan responded that he had spoken to his lawyer, who in turn told him not to make any statements, but, he added, that he was willing to provide as much information as possible. T10, 24. Kriplean attempted to clarify this statement by asking Chan whether he would answer questions. Chan responded that he was willing to cooperate, but that "I just don't want to incriminate myself." T11.

These statements were neither clear nor unambiguous. Chan was advised that he did not have to answer questions, but he indicated a desire to "provided as much

26

information as possible." He stated that he wanted to cooperate, but also that he did not want to incriminate himself. These statements are subject to "two reasonable, competing interpretations," *Acosta*, 363 F.3d at 1155, and, therefore, were ambiguous and equivocal. As a result, Kriplean and Wong could question him without first seeking additional clarification.

Neither of the cases relied upon by Chan compel or suggest a different result. *United States v. Lacouture* concerned whether the trial court erred in not allowing a witness to invoke her Fifth Amendment privilege in front of the jury. 495 F.2d at 1240. While that case involved a witness stating that she did not want to incriminate herself, it did not deal with the issue presented by this case–whether such a statement combined with other comments constitutes an unequivocal and unambiguous statement to stop the questioning. Equally unenlightening is *Williams v. Sec'y, Dep't of Corrs.*, a habeas corpus action, where the Eleventh Circuit held that the defendant's statement that, "This is being blown way out of proportion. I've touched her; she is always teasing me, but I don't want to incriminate myself," was equivocal and that the state habeas court's conclusion that it was not an invocation was not unreasonable. 195 Fed. Appx. at 941. Thus, *Williams* is of no assistance to Chan.

Therefore, for all of the above and foregoing reasons, the undersigned

AO 72A
(Rev.8/8
2)

**RECOMMENDS** that Chan's motion to suppress statements, [Doc. 35], be **DENIED**.

### III.   Evidence

#### A.   Facts

As noted above, FDA special agents received search warrants for Chan's parents' residence, [Docs. 16-2, 16-4], and the Mercedes Benz driven by Chan on the date of the execution of the search warrant at his parents' home.  [Docs. 16-6, 16-7].  Each warrant described the items to be searched for and seized as follows, in relevant part:

1.   All records[] relating to violations of the following statutes:

(a) Possession and/or distribution of listed chemicals namely ephedrine and  pseudoephedrine, in violation of Title 21, United States Code, Section 841(f)(1);

(b) Distribution in interstate commerce, including New York, Georgia and elsewhere, of misbranded and/or adulterated foods and/or drugs containing listed chemicals including but not limited to purported dietary supplements labeled to contain ephedrine alkaloids and products containing Active Pharmaceutical Ingredients (APIs), in violation of Title 21, United States Code, Section 331(a);

(c) Use of the mail and wires to perpetrate a scheme to obtain money under false and fraudulent pretenses, in violation of Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud).

(d) Fraudulently or knowingly sending from the United States purported dietary supplements contrary to law of the United States, in violation of Title 18, United States Code, Section 554;

28

2. All records involving The Wholesale Source, LLC and/or VeryLean Products, LLC since January 1, 2008, including:

(a) Any and all misbranded and/or adulterated foods and/or drugs.

(b) Labels, labeling, as well as advertisements, pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

(c) Paraphernalia for packaging, weighing, or distributing misbranded and/or adulterated food and/or drugs.

(d) U.S. currency, financial instruments, and other items of value and/or proceeds of manufacture, distribution, and/or possession of misbranded and/or adulterated foods.

[Doc. 16-7 at 3 (footnote omitted)].

### B.    *Arguments of the parties*

Chan argues that while the warrants might have authorized the search for and seizure of documents and records, including computer files, the warrants did not authorize the seizure of inventory, food products or adulterated food.  He further argues that to the extent that ¶ 2(a) of the warrants called for the seizure of such items, the warrants were ambiguous and thus had to be construed against the government.  [Doc. 16 at 5-6; Doc. 26 at 4-5].  He further argues that the plain view doctrine does not save the warrants because the items seized were not contraband.  [Doc. 16 at 6; Doc. 26 at 5-6].

29

In response, the government first claims that Chan has not alleged a sufficient privacy interest in his parents' home or in the Mercedes he was operating, which was titled in his mother's name, and contends that the Court should hold a preliminary hearing on the standing[6] issue.  [Doc. 19 at 24].  As to the merits, the government argues that the adulterated food was seized pursuant to ¶ 2(a) of each warrant.  [*Id.*].  It points out that limiting the allowable items to be seized to a narrow definition of "records" is an unreasonable interpretation, particularly since other portions of the warrant allowed the seizure of currency and other financial instruments, and other portions expressly called for the seizure of "records."  [*Id.* at 20].  The government also argues the adulterated food items and other inventory were seized properly pursuant to the plain view doctrine.  [*Id.* at 21].

### C.    *Discussion*

As for Chan's privacy interest in his parents' residence and the automobile searched, the Court concludes that Chan's declaration attached to his motion, [Doc. 16-

---

[6]    The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing."  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  However, the undersigned will use the word "standing" when referring to whether Chan had an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim."  *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

AO 72A
(Rev.8/8
2)

9], was sufficient to establish his standing in both his parents' home and the Mercedes. First, he avers that he used his parents' residence for business purposes, conducted all of his business transactions from that residence, kept his business records and computers there, and went to the residence on a regular basis. [*Id.* at 2]. As for the Mercedes, he avers that he was driving it with his mother's permission on the date that it was searched. [*Id.*]. The government does not challenge these factual assertions, only stating that his declaration was untested. [Doc. 25 at 19]. The Court disagrees that a preliminary hearing was required based upon the government's response.

Whether a movant has a legitimate expectation of privacy in a particular premises is determined in the totality of the circumstances. *See Rakas v. Illinois*, 439 U.S. 128, 130, n.1 (1978). Standing can be established with proof that the movant owned or rented the premises or otherwise enjoyed "an unrestricted right of occupancy or custody and control of the premises. . . ." *United States v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983) (internal quotations omitted). The burden is on the person challenging the search, and the motion to suppress must contain allegations of standing that are "sufficiently detailed and specific." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Eyster*, 948 F.2d 1196, 1209 (11th Cir. 1991)).

In this case, Chan alleged sufficient facts to establish standing to challenge the

31

searches and nothing in the government's brief challenges these facts.  Thus, Chan has

demonstrated a sufficient privacy interest to challenge the search of his parents'

residence that he used as his place of business.  *See v. City of Seattle*, 387 U.S. 541, 543

(1967) ("The businessman, like the occupant of a residence, has a constitutional right

to go about his business free from unreasonable official entries upon his private

commercial property."); *see also Oliver v. United States*, 466 U.S. 170, 178 n.8 (1984)

(mentioning "[t]he Fourth Amendment's protection of offices and commercial

buildings").  Likewise, he has demonstrated a sufficient privacy interest in his mother's

Mercedes.  *See United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (holding

that a driver using a vehicle with the permission of an absent owner has been found to

possess a reasonable expectation of privacy therein) (citing *United States v. Garcia*,

897 F.2d 1413, 1416-18 (7th Cir. 1990)).  Thus, the Court rejects the government's

standing challenge and proceeds to the merits of the claim.

As to the merits of his challenge to these searches, the warrants authorized the

search for and seizure of his inventory, including the dietary supplements and other

adulterated food items located at both locations.  The task of a reviewing court is not

to conduct a *de novo* determination of probable cause, but only to determine whether

there is substantial evidence in the record supporting the magistrate judge's decision

32

to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant." *United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) (citing *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991)).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  *Illinois v. Gates*, 462 U.S. 213, 236-37 (1983) (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States  v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).

Even assuming that an ambiguous warrant should be construed against the government, *see United States v. Salceda*, No. CR 10-274 CAS, 2012 WL 763583, at *9 (S.D. Cal. Feb. 27, 2012) (suppressing fruits of second, warrantless search where search warrant provided that agents had to search digital device within 60 days or return it unless they determined it contained data allowed to be seized under the warrant and then it could be retained "for further analysis"; court held term "for further analysis" ambiguous and construed it against government), here there was no ambiguity.  A realistic, commonsense and more than reasonable reading of the warrants demonstrates

33

that "[a]ny and all misbranded and/or adulterated foods and/or drugs" are in fact "records" of (or related to") Chan's suspected violations of possession or distribution of ephedrine and pseudoephedrine, distribution of misbranded and or adulterated foods and/or drugs containing listed chemicals, use of the mails and wires to perpetrate a scheme to obtain money under false or fraudulent pretenses, and fraudulently or knowingly sending from the United States purported dietary supplements in violation of federal law.  "Whether evidence is within a search warrant's scope requires not a 'hypertechnical' analysis, but a 'common-sense, and realistic' one." *United States v. Okorie*, 425 Fed. Appx. 166, 169 n.1 (3d Cir. Apr. 26, 2011) (quoting *United States v. Srivastava*, 540 F.3d 277, 291 (4th Cir. 2008)); *see also United States v. Hager*, 710 F.3d 830, 835 (8th Cir. 2013) (discussing whether agents acted within the scope of a warrant and holding that "[t]he broad language of the warrant must be given a practical, rather than a hypertechnical, interpretation that is cabined by the purpose for which it issued").  Therefore, the executing agents did not exceed the scope of the warrant's authorization.  As a result, the undersigned **RECOMMENDS** that Chan's motion to suppress evidence be **DENIED**.[7]

---

[7]       Since the Court rejects Chan's challenge to the warrant, the Court need not discuss whether the seizure of the inventory was justified under the plain view doctrine.

34

AO 72A
(Rev.8/8
2)

## IV.    Return of Property

### A.    Arguments of the parties

Chan contends that the government's seizure of $666,655.46[8] and three automobiles (two of which were titled in his parents' names)[9] for forfeiture deprived him of his rights to due process and counsel, in violation of the Fifth and Sixth Amendments.  [Doc. 16 at 1-3].  Although acknowledging that generally the government is entitled to seize the fruits of unlawful activity, he argues that, in this case, the affidavit supporting the seizure demonstrated that from 2002 to 2012, at least 23 percent of his income was derived from lawful activity.[10]  He argues, therefore, that since the government did not establish that the money seized from the bank account or

---

[8]     Pursuant to Seizure Warrant No. 1:12-MJ-1127-RGV (N.D. Ga. Aug. 23, 2012) [Doc. 25-1].

[9]     Pursuant to Seizure Warrant Nos. 1:12-MJ-1156-RGV (N.D. Ga. Aug. 29, 2012) [Doc. 25-2] (authorizing seizure of 2012 Mercedes Benz E350W4, titled to Jan Ying Chan), 1:12-MJ-1145-RGV (N.D. Ga. Aug. 29, 2012) [Doc. 25-3] (authorizing seizure of 2005 Lamborghini Gallardo, titled to Defendant Chan), and 1:12-MJ-1129-RGV (N.D. Ga. Aug. 23, 2012) [Doc. 25-4] (authorizing seizure of 2007 Nissan Xterra, titled to Kaung. H. Chan).

[10]     The basis for this figure was as follows:  Kriplean's affidavit in support of the various search warrants issued on August 27, 2012 alleged that Chan's company had $6,156,041.00 in total sales between 2008 and 2012, of which $4,754,604.00 was traceable to ephedrine products.  He claims that the difference of $1,401,437.00, therefore, was lawfully-earned income.  [Doc. 16 at 2 n.1].

the funds used to purchase the vehicles was wholly from unlawful sources, and his lawfully-acquired income was sufficient to generate such a bank account balance or purchase these assets, the assets, or at least 23 percent of them, should be returned to him to allow him to pay for his defense.  [*Id.* at 2-3].  Alternatively, he asked for a hearing to determine if the proceeds could be traced to unlawful activity.  [*Id.* at 3 (citing *United States v. Kaley*, 677 F.3d 1316 (11th Cir. 2012))].

In its response, the government noted that in September and October 2012, it filed a complaint and amended complaint for forfeiture in case number 1:12-cv-3229-CAP, seeking to have forfeited to the United States (1) the real property at 87-37 Justice  Avenue, Elmhurst, Queens ("Justice Avenue")[11]; the $666,655.46 in the bank account; the Mercedes E350W4; the Lamborghini; the Nissan; and assorted collector coins.  [Doc. 25 at 4].  Chan did not file a claim as to the Mercedes E350W4 or the Nissan.  [*Id.* at 4-5].  Instead, the government submits, Chan's mother filed a claim as to the Justice Avenue property and the Mercedes, his father filed a claim to the Nissan, and Chan only filed a claim on behalf of the Wholesale Source LLC as to the $666,655.46, claiming that it was the owner and bailee of the funds.  [*Id.* at 5].  The

---

[11]        This property is subject to a *lis pendens* but has not been seized.  [Doc. 25 at 6 n.6].

36

forfeiture action has been stayed on Chan's motion.  [*Id.* at 5-6].  The pending indictment listed the Justice Avenue property, the $666,655.46, the Mercedes E350W4, the Lamborghini, and the coins as subject to forfeiture.  [Doc. 1 at 9-11].

The government contended that, on these facts, Chan's motion lacked sufficient allegations to establish standing as to at least some of the items seized or an inability to pay for his defense such that the seized property had to be returned.  [*Id.* at 8-11]. It then argued that courts employ the *Barker v. Wingo*, 424 U.S. 319, 335 (1976), four-factor test, initially developed for analyzing speedy trial claims, when determining whether to order the return of restrained assets before trial, as required by *United States v. Kaley*, 579 F.3d 1252, 1260 (11th Cir. 2009).  It then argues that Chan is not entitled to a hearing or relief on his claim.  It argues that even though the assets were seized in August 2012 and the indictment was returned 20 months later, the government promptly filed its civil forfeiture action and Chan moved to stay those proceedings pending the criminal trial.  [Doc. 25 at 14-15].  Thus, it argues the first three factors–length of delay, reason for delay, and the defendant's assertion of his rights–weigh in favor of the government.  [Doc. 25 at 14-15].  As for the fourth factor–prejudice–the government argues that its interest in the seized assets outweighs any interest Defendant has in a pre-trial hearing.  [*Id.* at 15-16].

37

In reply, Chan argues that his business sold many types of nutritional substances and that no argument can be made that all of his assets were derived from unlawfully-sold products.   [Doc. 26 at 6].   He further argues that the ephedrine ban was promulgated in 2004, but the seizures occurred in 2012; he submits since he did not manufacture ephedrine, there is reasonable doubt that 77% of his sales constituted ephedrine-based products.  [*Id.*].  He argues that this is an appropriate case for a pretrial hearing.  [*Id.*].

### B.      Discussion

The government has the better argument.  First, Defendant did not demonstrate that other than the Lamborghini, he has standing to challenge the seizure of the other assets.  The Mercedes is titled in his mother's name and the currency seized from the bank account was in the LLC's bank account.  (There is no discussion of the ownership of the coins in this record.)

Moreover, a defendant may not challenge the competence or reliability of the evidence on which the grand jury based its finding of probable cause.  *See Kaley v. United States*, 571 U.S. __, 134 S. Ct. 1090, 1097-98 (2014); *see also United States v. Dwyer*, No. 15-11435, 2015 WL 5472505, at *2 (11th Cir. Sept. 18, 2015).  As a result, Chan cannot argue that the grand jury's indictment, which concludes that the assets are

38

subject to forfeiture, is not based upon probable cause.

Further, as noted by the government, a defendant whose assets are restrained pursuant to a criminal forfeiture charge in an indictment, rendering him unable to afford counsel of choice, is entitled to a pretrial hearing only if the balancing test enunciated in *Barker* is satisfied. *Kaley*, 579 F.3d at 1353; *see also United States v. Bissell*, 866 F.2d 1343, 1352 (11th Cir. 1989). Here, while the 20-month delay between the seizure and the indictment triggers application of the other *Barker* factors and is counted against the government in this analysis, Chan's seeking of a stay of the civil proceedings involving many of the same assets—albeit for a legitimate reason so as to not potentially prejudice his criminal case—means that the second and third factors–the reason for further delay and his assertion of his right to a speedy resolution of the forfeiture issues–are counted against him.

As to the fourth factor of prejudice from the delay, this factor also is in favor of the government. First, the government has a significant interest in preserving the assets for forfeiture. Second, as noted, the only property that Chan seeks to have unrestrained in whole or in part is the sums in the LLC's bank account, and he has not established that he has standing to challenge the pretrial restraint of those funds.

Accordingly, Chan is not entitled to a pretrial hearing on the restrained property

AO 72A
(Rev.8/8
2)

nor the release of any of the property to pay for his defense.

## V.   *Conclusion*

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Chan's motions to suppress evidence and for release of funds, [Doc. 16], and his motion to suppress statements, [Doc.35], be **DENIED**.

The Court has now ruled on all matters referred to it.  There have been no impediments identified to the scheduling of trial.  Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 16th day of November, 2015.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

40